And at this time, we'll hear United States v. Henry. Nicely argued, gentlemen. Thank you. Good morning. May I proceed? By all means. May it please the Court, Mark Furnish this morning for Mark Henry. Your Honors, this is a classic over-criminalization case. We're told again and again by the Supreme Court, and this one, that Sienta is the critical line separating guilty and innocent behavior, constitutional and unconstitutional statutes. Yet the jury instructions here, defining willfulness as merely acting with a bad purpose to break the law and adding a conscious avoidance charge to boot, turned a highly technical regulatory regime into a virtual drag net for reckless or grossly negligent defendants. And the effect of that is this, raising the same notice and vagueness concerns that a heightened mens rea requirement is said to eliminate. And I would suggest to the Court that if there were ever a picture of the hyper-technical statute that requires this sort of heightened mens rea requirement, the AECA and the ITAR, and I know it's alphabet soup, is that. And you might have read the opening brief and wondered about the need for the first point and why there was so much detail about what's in the, what's on, I should say, the munitions list. And the munitions list makes the eyes glaze over, and I pity the person in this case. It was me. Well, it doesn't necessarily make the eyes glaze over if you're somebody who is selling munitions. Well, that's a great point, Your Honor. What are we selling? We're selling ablative materials that are not necessarily or inherently malign, that an ordinary person, and Mark Henry is no Kim Jong-un, as Your Honors have undoubtedly gleaned from the record. This is a man who's operating out of an apartment, a living room in Flushing, Queens, and you can glean from the record that he's hapless, he's harried, and not the most sophisticated, the prototype arms dealer, and we collected all the cases where. But I don't see how you can claim that he didn't have any notice that this material was subject to license because the warning came from the seller and it was in all capitals. Well, it's not so much a notice, Your Honor. It's the standard of knowledge required by the jury instructions and more fundamentally required by the Congress that drafted the statute. So a mere notice. He doesn't have to know that it's exactly listed. He just has to know that it's illegal to do it. No, that's, sir, respectfully, that's what the court charged under the Bryan standard, and that's what the instruction said. But this is just like the analog drug statute and securities law. You don't have to know the exact SEC regulation you're violating. You just have to know that the conduct's wrongful, and many times the way you behave evinces that, like instructing the supplier to mislabel the packaging with regard to it. Well, respectfully, I don't think general knowledge of wrongfulness or anything. Why would he have the manufacturer mislabel the product if he didn't know that it was actually labeled the right thing, that it might raise some problems? Well, sir, to be fair, we haven't contested the sufficiency of the evidence at all. Right, you haven't. I know that. And so you don't like the way Congress has structured it, but it's not a constitutional violation that it be just wrongful conduct as opposed to a specific knowledge conduct, that this was listed on some executive order that listed this as requiring a license. Well, I don't like the way Congress has structured the statute. I don't like the way Congress does a lot of things, but I'm stuck with it, and so are you. Well, here's the thing. I don't like the way they structured it, and what they did to prevent a finding of unconstitutionality on delegation grounds is included at the same time a heightened— Devious devils, those people down in Washington. I'm sorry? Devious devils. Well, what they did, instead of dumping it just over to the executive branch, they also included a willfulness requirement in the statute, and that makes it different from the analog drug statute or the SEC statute and brings us into the realm of rat's laugh and cheek. SEC is definitely a willful standard. Right, but as we outlined in the brief, there's certainly different meanings of willfulness, and it's the most—one of the more slippery concepts in the law, and we already have a precedent on point from our circuit, which is Smith, and they held—they analyzed what the jury instructions were for the AECA. Sorry about the acronyms. And they said the appropriate definition of willfulness is not that you have to know the precise chapter and verse of where in the statute the ablative materials is. I grant you that. But what you do have to know is that the particular— and the jury has to be instructed that the particular item going to the particular place required a license and that you intended to export it without a license. The jury was not told that here. What it was told, in contrast, was that general knowledge that it was unlawful to do in a vague general sense, including, for example, Henry's defense to help the recipient evade Taiwanese tax law would suffice. And on top of that, the knowledge requirement, the willfulness requirement, was watered down even further by the inclusion of a conscious avoidance charge. So it's a twofold problem. So the conscious avoidance charge didn't even require so much as actual knowledge of illegality. He argued that his father—and didn't he present proof that daddy did it, and he didn't, and so even though daddy did it on his computer and his e-mail account, and so wouldn't the conscious avoidance charge be appropriate since it would be daddy who got the e-mail that said you had to have a license for this? So we're not contesting that there's a factual basis for giving the charge. What we're contesting is two things. Conceptually— It goes to knowledge as opposed to intent. Well, that's another sub-issue. The way it was charged, willfulness, by the definitions here, has a knowledge and an intent component, and it's sort of black-letter law in our circuit that conscious avoidance is not a proxy for intent. So the way it was charged, the judge made it a proxy for both, but that's sort of a sub-issue. Conceptually, when you have the sort of willfulness requirement that we contend is an issue here, which is a heightened mens rea standard that requires knowledge of the necessity for an export license for this particular item, a blade of materials to China—to Taiwan, I should say. There was an acquittal on the first charge. That is logically incompatible with the notion of a conscious avoidance charge for this type, this type of heightened willfulness statute. That's the first thing. And the second thing is that the charges given was linguistically incorrect for all the reasons enumerated in the brief. So it's a conceptual problem more than a factual predicate for the charge problem. You're claiming that the willfulness charge was such that he could have been convicted for arranging tax evasion. Among other things, and we spelled out—I mean, we went through the defense theory in some detail, and if you look on page 42 of our opening brief, this is what the defense said in summation, that Henry, quote, had some general awareness of export licensing, but never knew that these particular products actually needed a license to go to Taiwan, and we're quoting from T56 there. Well, under that defense theory, he's guilty under the charge as given, and that charge as given understates the willfulness requirement and the knowledge that's necessary to convict under the statute. So she effectively charged the defense out of the case, and what's unusual about this especially is there is the precedent of Smith that is squarely on point, and they held in Smith, this court did, that what we're talking about, knowledge of the licensing requirement, that he needed a license to export this particular product, is not only a sufficient charge but an appropriate charge in the AECA context, and that's because this area—and I grant you that people who are going to be dealing in this stuff aren't babes in the woods. I'm granting you that. But you're saying your client is a babe in the woods and then even a babe in the living room. A babe in the living room, but here's the thing. There's lots of conduct in our society that falls into a gray area, and it's not inherently illegal to engage in gray area conduct. So you have to look at, in this case, what the substance is. We're not talking about AK-47s. We're not talking about ammunition. We're not talking about something that anybody off the street, including a sophisticated dealer, would obviously know is bad news. Would this charge be sufficient if it was AK-47s? Well, if we had AK-47s, I don't think the charge would be sufficient, but it would undoubtedly be an academic or harmless error type issue because anybody knows what that is. Ablative materials, and thanks to Ms. Graham, the government at trial sort of mocked the idea that anybody could get this off the Internet, and he had to be sophisticated. Well, we just typed in a Google search, and the supplier of the material was the first search result returned. So this is a different beast because of the nature of the material and the nature of the defendant. So in this case, I contend, and I think the cases show it, that the sort of charge that we requested is required in all AECA cases, but it might be an academic issue or a harmless error issue in another case, but not this case. Just before you sit down, you mentioned Smith a couple times. Smith was decided before Bryan, right? It was, but it was also decided before Cheek and Ratzlaff, so it's six in one, half a dozen of the other. Smith, though, was about whether the jury charge was sufficient. It didn't say it was necessary, did it? It said it was sufficient and it said it was appropriate. You used the word sufficient. And it also used the word appropriate. Okay. Thank you. Thank you. You've reserved rebuttal. I did. Thank you very much. We'll hear you then. Good morning. May it please the Court, Assistant United States Attorney Michael Lockhart for the appellee of the United States of America. I'd like to tether the arguments that were made to the charges that were actually given to the jury in this case. I don't think a fair reading of those charges makes it clear that the jury could not have convicted on any theory of negligence or recklessness. The charges actually given did require knowledge of the elements that knowledge is required for under the statute. The jury was instructed that the defendant had to know that his conduct was unlawful and that he had to have the intent to do something that the law forbade him to do. Why would it have been possible for the jury to convict him based on the fact that he knew darn well that what he was engaged in was tax evasion? The charges given, I don't think, permit that conclusion. I don't think this jury could have . . . Why not? Your adversary slung together a number of things. It doesn't sound likely, but the question is, is it plausible? It's a criminal case. Looking just at the charges themselves, immediately after the instruction on willfulness, the court then delivered the instruction on conscious avoidance and instructed the jury that you could not convict the defendant if he actually believed that exporting the ablative material without a license was lawful. I think it's pretty clear to the jury that we're talking about exports under the United States law and not about tax law in Taiwan. I think it's also clear from the fact, just the nature of the proof and the nature of the defenses, there was never any argument made to the jury by the government that an intent to violate a foreign tax law would be sufficient to convict here. This evidence and this argument was all about his knowledge and his knowing conduct in exporting these materials unlawfully. There's really no notice issue here either. I think the questions have hit it on the head. This isn't about whether the USML writ large can take you a long time to read. It's about what notice this defendant had in his conduct in exporting these military items was unlawful. We're talking about an ablative material that is specifically designed for use in missile and aerospace technology. We're talking about an ablative material that on document after document, the distributor warned the defendant that an export requires a license from the Department of Defense, which is a slight misattribution of the correct licensing agency, but puts the defendant on notice that this is a defense-related material. The evidence showed that the defendant discussed the licensing requirement with his overseas customer. He was informed by his overseas customer that this was being purchased for a foreign military. There's numerous examples of using shell companies and false names, disguising the freight forwarder with another shell company to disguise this was going to be exported. There's all sorts of evidence that this was an export violation and that he knew that, and the jury was appropriately instructed about the willfulness element of that offense. Let me ask you about the use of an interpreter at trial. Yes, Your Honor. Are you aware of any support for the proposition that the Sixth Amendment creates an absolute right to waive the use of an interpreter at trial? I'm not aware of any support for that proposition, and in fact, a lot of rights that the defendant is entitled to waive at trial or otherwise are conditioned and require the approval and supervision of the presiding court to approve that waiver. There are two aspects of the use of the interpreter here. First, I think it's apparent that the district court has to have some discretion. The statute commits discretion to the presiding judicial officer about whether to approve a waiver. The case law is clear that the defendant's trial rights, including the right to testify on his own behalf, is subject to qualification by the rules of evidence and other rules, and there's an ample basis for the district court here to have decided that the use of an interpreter was appropriate, to ensure that the trial was fair, to ensure that the defendant would fully understand the proceedings, especially given his counsel's acknowledgment that the defendant's facility with English, though good, was not good enough to avoid misunderstandings. The defendant was afforded the right to testify with an interpreter on a standby basis, so that he could testify in English, although he did on occasion use the interpreter, I think giving some ex post justification to the district court's exercise of its discretion in the first instance. Was there any part of the instruction, the instructions of the court devoted to this question of the interpreter? Was there any description to the jury of how or why an interpreter was being used? There was an instruction given to the jury about the use of an interpreter. It was a brief instruction that advised the jury to draw no inferences whatsoever from the use of an interpreter. Let me ask you about Bryan v. United States, to which Judge Wesley referred earlier. Is it the government's view that the instructions described in Bryan v. United States apply here, and that the charge accorded with that decision? The answer to both of those questions is yes. Bryan involved another licensing situation where, as the court described at the trial, there was ample evidence from the defendant's conduct that the defendant knew that dealing in firearms was unlawful. The defendant used straw purchasers. There was filing off of serial numbers and other efforts to falsify the items at issue, but apparently no evidence about the defendant's belief about why dealing in the firearms was unlawful. And the Supreme Court held that the willfulness element doesn't require that. And as this court has explained, I think, in George, the willfulness requirement is to distinguish innocent conduct from culpable conduct. This court typically applies the standard of willfulness that is at the minimum required to distinguish those two types of conduct. And knowledge that somebody is engaged in conduct that is unlawful is sufficient to protect the innocent and to convict the guilty. And the instruction given in this case amply satisfied that purpose. So absent any other questions, thank you, Your Honors. Thank you. We'll hear rebuttal. Yes, thank you. Three quick points. First, to Judge Cabranes' inquiry, it was a pointed inquiry, and nobody contends, at least from this table, that there's an absolute right to waive use of an interpreter, or for that matter, most constitutional rights. The point is that there was no basis for overriding the waiver here, because the only reason articulated was his purported difficulties with the English language. Well, contrary to what my friend just said, he testified at great length in English without significant incident, first of all. Second of all. But there was resort now and then to the interpreter. Well, that only points up the failure to consider any alternatives, one of which was having an interpreter on standby, which is exactly what occurred during the course of his testimony. So the Court doesn't need to reach the issue of whether there's an absolute right, because we're not pressing that claim at all. It's just that if you ---- What is the claim you're pressing on that score? Well, the claim would be analogous to the rejection of a waiver, say, of a conflict, an attorney conflict, and the denial of conflict of choice, which is why the Iowa case, and, you know, they say rightly I'm pulling out some case from Iowa. It's a pretty novel issue, and the case was, the rationale, anyway, was stunningly on point, because it was exactly what I was thinking of from Gonzalez-Lopez. This is about autonomy and the defendant's right to chart his own course, because when he goes to prison, he has to, and I've said this before before this Court, he's the person who has to sit there for six and a half years and put his head down at night, and absent the decisions that are exclusively reserved to his defense lawyer, he's got to be able to put his head down there at night and say, I did what I wanted to do. I presented the defense the way that I wanted, and it didn't work, and I'm going to pay the price for it now. What exactly was the prejudice caused by the district judge's decision on the interpreter? Well, that's really the point, Your Honor, and it's why I invoke Gonzalez-Lopez in this Iowa case. It's a structural error. A conventional prejudice analysis would never work in a case like this for two reasons. It's a structural error. Yes. There is an absolute right. No. No, no. The point is, Judge, if the waiver is erroneously overridden, then it's a per se reversible error. So there's two, the question is whether the judge was correct to refuse to let him to waive the interpreter or even to consider a standby. And if there's a finding that that's error, then it's per se reversible, because you're denying the right of autonomy more than fairness in the Sixth Amendment in this context, like Feretta, right? If you waive the right to counsel, you're probably going to do a pretty lousy job on your defense, and the trial is going to be less fair. But the Supreme Court says, we're not talking about fairness in this context. We're talking about autonomy and self-determination, and that value is intangible and immeasurable. So you get a per se reversal if the defendant is forbidden from going forward pro se. And that's the line of cases that's manifest in Gonzalez-Lopez and most recently in the Massachusetts case that I referenced in the 28J letter. And that's exactly the line of reasoning that this Iowa case employed. And I get it, it's an Iowa appellate court, but the reasoning is squarely on point. And it's faithful to the Gonzalez-Lopez and Feretta line of cases. And the other thing besides autonomy, the prejudice is incalculable. It's not the kind of thing you can objectively measure, so it evades harmless error analysis. It's like an apples and oranges question if there's a finding of error. Thank you. Okay, thank you very much. Thank you both. We'll reserve decision.